UNITED STATES *v.* GEO. WM. RUEFF, INC. (No. 4735)[1]

[1] C. A. D. 535.

United States Court of Customs and Patent Appeals, June 24, 1953

*Charles J. Wagner*, Acting Assistant Attorney General (*Joseph E. Weil* and *Richard F. Weeks*, special attorneys, of counsel), for the United States.

*James J. Morrison* and *Lawrence, Tuttle & Harper*, Associate Counsel (*George R. Tuttle* and *Lawrence A. Harper* of counsel) for appellee.

*Wm. Whynman, amicus curiae.*

[Oral argument April 13, 1953, by Mr. Weil, Mr. Whynman, Mr. Morrison, and Mr. Tuttle]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges

WORLEY, Judge, delivered the opinion of the court:

Here the Government appeals from the judgment rendered by the Second Division of the United States Customs Court, pursuant to its decision, C. D. 1392.

Involved in the controversy is merchandise consisting of 1,680 bales of sisal twine, imported from Mexico and entered at the port of New Orleans, Louisiana, on or about July 13, 1947. It was classified as "twine, single or plied, wholly or in chief value of sisal," and was assessed with duty at the rate of 20 per centum ad valorem pursuant to the provision of paragraph 1005 (b) of the Tariff Act of 1930, as modified by the Trade Agreement with the Netherlands, T. D. 48075, and the Trade Agreement with Mexico, T. D. 50797.

The importer, appellee here, protested that classification and assessment and claimed that the merchandise was entitled to free entry under the provisions of paragraph 1622 of the above act as "binding twine," and alternately claimed that the twine was free of duty as "agricultural implements, or parts thereof" within the provisions of paragraph 1604 of the Tariff Act of 1930.

Inasmuch as the Customs Court denied the applicability of the last mentioned paragraph, and since no appeal was taken from that action, it is not before us for consideration.

The paragraphs in question read as follows, paragraph 1005 (b) under both trade agreements being identical:

1005 (b)    Cords and twines (whether or not composed of three or more strands, each strand composed of two or more yarns), tarred or untarred, single or plied, wholly or in chief value of manila (abaca), sisal, henequen, or other hard fiber.        20% ad val.

Par. 1622. All binding twine manufactured from New Zealand hemp, henequen, manila, sisal, or Tampico fiber, sisal grass, or sunn, or a mixture of any two or more of them, of single ply and measuring not exceeding seven hundred and fifty feet to the pound.

It was the contention of the importer that paragraph 1622, *supra*, in providing for all binding twine manufactured from the fibers or grasses therein specified, of single ply, and not exceeding 750 feet to the pound, should be literally construed, and that any twine used for binding in harvesting operations which met the limitations of the paragraph was included therein; and that since the merchandise at bar is a single-ply twine, manufactured wholly from Mexican sisal, running less than 750 feet to the pound and chiefly used to bind hay into bales, it is "binding twine" within the meaning of paragraph 1622 and thus entitled to free entry.

On the other hand, the Government and *amicus curiae* based their arguments primarily upon the theory that "binding twine" and "binder twine" are synonymous terms and that since the record shows the involved merchandise is not "binder twine" then it is not "binding twine," as provided for in paragraph 1622, *supra*. The Government also urged that the importer failed to establish that the chief use of the imported merchandise, at or about the time of importation, was in the binding of small grains.

In support of the respective arguments of the parties, seventeen witnesses were called and numerous exhibits were introduced in evidence.

From the record it appears that the merchandise at bar is a twine manufactured from sisal grown in the state of Yucatan, Mexico. Its manufacturer describes the product substantially as follows:

* * * The sisal fibers are fed into hackling machines, during which time an emulsion of mineral oil, animal greases, and insect repellent is poured over them. The fibers are then put through machines called breakers, spreaders, draw frames, and finishers from which they emerge in the form of a non-ending sliver. The sliver is then spun into one-ply twine which is wound into cylinders, balls, or tubes, weighing approximately 20 pounds each. Each tube is approximately 10 inches in diameter and 13½ inches in height. At the time of importation, the twine was packed four balls to the bale. Presently, it is packed two balls to the bale.

The record also discloses that this type of twine was not in existence at or prior to June 1930, the date of enactment of the present tariff act, and was not introduced into trade and commerce until the early 1940's.

The twine seems to have been designed to meet the requirements of a new type of automatic hay-baler machine, which came into general

use during 1945. It also appears that the twine used in those machines runs about 200 feet to the pound, has an average tensile strength of approximately 240 pounds, and contains from 12 to 15 per centum oil by weight. It is usually treated with an insect repellent which also serves to repel rodents. Grease is used on the twine to soften it, while the oil lubricates and serves to expedite its passage through the hay-baler machine and also functions as a protector against humidity, mildew, and rot.

The manner in which the subject twine is employed in the hay-baling machines is described by one of the witnesses as follows:

* * * The twine is accommodated in sort of a can dispenser, inside of the machine, and feeds through the mechanism, tying mechanism. The machine operates with a plunging device that compresses this hay in the bale or in this compartment in the machine. The twine is mechanically put around lengthwise on the bale, two strands. There are, incidentally, two tubes operating; one makes one strand and one the other, and at the time the bale reaches its capacity the mechanism trips and these two strands make it a bound bale.

The bale as thus bound is generally a rectangular cube approximately 18 x 18 x 36 inches, and weighs from fifty to seventy-five pounds.

With reference to binder twine, the trial court had the following to say:

* * * binder twine is ordinarily employed in binder machines for wrapping or tying sheaves of small grains. Binder machines cut the grain before conveying it into the machine for binding. Automatic hay-baler machines do not cut the hay. They come into operation after the hay has been cut and left in the fields in the form of windrows or swaths. Binder twine for use in binder machines is manufactured substantially the same way as is baler twine. The same machines are used and the same general treatment is accorded them, except that binder twine does not usually have the specific rodent repellent. Binder twine is packaged normally in either six 8-pound balls or 10 balls weighing slightly under 5 pounds each. It usually is either 500 feet to the pound, 550 feet to the pound, 600 feet to the pound, or 650 feet to the pound, with the variety in most prevalent use in the United States being 500 feet to the pound. It has an average tensile strength of approximately 85 to 90 pounds. It contains as a rule not less than 10 per centum of oil. In the operation of the binder machine, the general mechanism for binding the sheaf is similar to the mechanism of the baler machine for tying the hay. * * * The tensile strength of baler twine is necessarily much greater than that of binder twine because the bale of hay is subjected to considerable pressure to compress it, and expansion in the fields after the bale has been made would cause a lighter twine to break. Bales of hay are normally kept from 1 to 3 years before consumption. Sheaves of grain are not usually left in the field more than 2 weeks.

Without further burdening this opinion with a detailed analysis of the testimony, we believe it sufficient to state that the record fairly supports the conclusions that baler twine cannot be used in a binder machine; that binder twine cannot be used in a baler machine (with the exception of one type of automatic hay-baling machine mentioned in the testimony); that the binding twine is used in the tying or

binding of small grains, whereas the baling twine is used in the tying or baling of hay; and that the inherent differences in the two agricultural products upon which they are used necessarily require a difference in the tensile strength and other characteristics of the respective twines.

It is our view here, as cogently observed by the trial court, that

With respect to the principal contention of plaintiff, to wit, that paragraph 1622, *supra*, provides for the instant merchandise, the controversy between the parties culminates, not because of a conflict in facts, but rather through contrasting views as to the proper construction and application of the provision in said paragraph for *all* binding twine.

The free-list provision for "*All* binding twine manufactured from * * * sisal grass, * * * of single ply and measuring not exceeding seven hundred and fifty feet to the pound" has appeared in substantially that form, except with respect to the number of feet to the pound, which has varied from 600 to 750 feet, since the enactment of the tariff act of August 28, 1894. Prior thereto, in the act of October 1, 1890 "all binding twine manufactured in whole or in part from * * * sisal grass * * *" was subject to a duty of seven-tenths of 1 cent per pound.

The court then went into an extensive examination of the circumstances surrounding Congressional action which resulted in the complete removal of duty on binding twine, and concluded that such action was taken for the benefit of the American farmer.[1]

The court then observed:

It is fairly deducible from a review of the foregoing references that not only was the phrase "binder twine" more frequently employed, but that Congress was clearly apprised of the fact that the term in common speech for the description of twine used in harvesting operations to bind small grains into sheaves was "binder twine." Nevertheless, and with a consistency that must be deemed significant, on seven separate occasions since 1890, Congress has employed the phrase "All binding twine." The only limitations on binding twine that Congress has imposed in each instance in which binding twine has been included in the free-list provisions, are that the binding twine shall be of single ply and shall not exceed a certain maximum footage per pound.

The record in the instant case establishes that binder twine, that is, twine for use in binder machines for harvesting and wrapping small grains, has for many years been bought and sold in certain specified lengths per pound only, to wit: 500 feet per pound, 550 feet per pound, 600 feet per pound, and 650 feet per pound. These lengths, as explained by several of the witnesses in the instant case, were the most satisfactory for giving the farmer the greatest tying potential and could most satisfactorily be accommodated in the containers of the binder machines. For all that appears of record in the instant case, binder twine in lengths per pound, other than those hereinabove enumerated, has never been used. Never-

[1] See House Report No. 234 to accompany H. R. 4864, Fifty-third Congress, Second Session, December 19, 1893; House Report No. 1466, Fifty-first Congress, First Session, to accompany H. R. 9416, page 261; House Report No. 234, *supra*, pages 289, 324; Hearings before the Committee on Ways and Means, House of Representatives, Fifty-third Congress, First Session, pages 789, 806, 807; Hearings before the Committee on Ways and Means, House of Representatives, Fifty-fourth Congress, Second Session, pages 1288, 1289, 1290; Hearings before the Committee on Ways and Means, Sixtieth Congress, page 4679; Tariff Commission Surveys on the articles in paragraphs 267, 268, 269, and 270 of the Tariff Act of 1921, schedule J, pages 65, 71; Summary of Tariff Information, 1921, on the Tariff Act of 1913, pages 1252, 1253; Summary of Tariff Information, 1929, on the Tariff Act of 1922, pages 2213, 2214; Summaries of Tariff Information, 1938, Volume 10, pages 30–40.

theless, Congress, in imposing limitations upon the type of merchandise it proposed could be imported free of duty as binding twine, specified a maximum footage per pound in excess of the greatest length normally in use and imposed no minimum length specification. *It would appear, therefore, that Congress had in mind, and intended the provision to cover, more than the article known in the trade as binder twine. Indeed, the inclusion of the word "all" in the provision would seem to preclude proof of commercial designation to limit the scope of the provision.* (Italics ours.)

We find nothing in the record which would in anywise cause us to disagree with the correctness of the conclusions thus arrived at by the trial court.

Coming then to an interpretation of the term "binding twine," as used in paragraph 1622, there is no doubt in our minds as to the validity of the Government's contention that the term has been used synonymously and interchangeably with the term "binder twine" in judicial decisions as well as in Congressional proceedings. However, it does not necessarily follow that such use of the terms precludes admission of the involved twine into the provisions of paragraph 1622. The definitions cited by the trial court show that the term "binding twine" is not limited solely and exclusively to the tying or binding of small grains, but are flexible enough to include twine of the instant type in harvesting operations for tying or binding purposes.

While there are, as pointed out above, some differences in the physical composition of the two twines, at the same time they also possess many similar physical characteristics as well as in the common use to which they are put. Both are used in what are clearly agricultural pursuits, viz, in the binding of small grains and in the baling of hay. See *Wilbur-Ellis Co.* v. *United States*, 26 C. C. P. A. (Customs) 403, 407, C. A. D. 47.

While it is true the involved twine was not in existence when the Tariff Act of 1930 was enacted, it is axiomatic that Congress legislates for the future as well as for the present, and we must assume that Congress, in writing the instant paragraph, imposed therein all of the limitations which it intended that class and kind of merchandise to bear. Clearly, it was not necessary for Congress to employ the word "all" unless it intended that word to encompass *all* of the twine which met the specific requirements thereof. We are in agreement with the trial court that the involved twine meets those limitations and that paragraph 1622 should control.

Moreover, it is our view that to hold otherwise would result in an anomalous and undesirable situation. For example, a farmer using binding twine in the agricultural pursuit of harvesting small grains would be using a twine completely free of duty, whereas his neighbor across the fence, likewise engaged in an agricultural pursuit, the baling of hay, and using a twine meeting the physical specifications of the same paragraph under which the binding twine was entered, would be compelled to pay a duty. If Congress intended, as both

the trial court and this court believe to be the case, that the instant paragraph was enacted for the benefit of the farmer in his agricultural pursuits, then such a situation would be absurd. We concur with the view of the Customs Court that the language of paragraph 1622 is clearly broad enough to avoid such an anomaly.

The evidence of record leaves no doubt that the chief use of the involved twine was in the baling of hay. No witness testified or even suggested any other use. Moreover, there is a stipulation by counsel for the respective parties that "* * * it is agreed that at the time of the importation herein, baler twine was chiefly used in automatic or pick-up baling machines for the baling of hay."

We note in the briefs of the parties that great emphasis is placed upon the probable reasons for the enactment of Public Law 219 (approved October 25, 1951) in which Act paragraph 1622 was amended by adding the words "and twine chiefly used for baling hay, straw and other fodder and bedding materials."

Counsel for the Government and *amicus curiae* urge that such action is evidence that the original paragraph did not include twine such as that at bar.

Appellee, on the other hand, urges that such amendment is evidence that Congress intended only to clarify its original intent and to void the ruling of the Commissioner of Customs which, in 1945, placed twine such as that at bar under paragraph 1005 (b).

The various cases and authorities cited in support of those conflicting views have been examined but we have found none of them to be in point with the circumstances present here. About the only thread of continuity we have been able to obtain from the authorities cited is that the particular facts involved in each case largely determine the proper interpretation to be placed on subsequent Congressional action. We believe the circumstances here are more than ample to support our conclusion that Congress intended only to clarify the language originally employed in paragraph 1622.

For the reasons hereinbefore given, the judgment of the United States Customs Court is *affirmed*.

JOHNSON, J., dissents.